MEYER CAUMAN & another *vs.* AMERICAN CREDIT INDEMNITY COMPANY OF NEW YORK.

Suffolk.     November 20, 1917. — January 14, 1918.

Present: RUGG, C. J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Agency*, Scope of authority.   *Insurance*, Credit.

One who knows that he is dealing with a special agent is bound to ascertain the nature and extent of his authority.

A general agent of a credit insurance company has no power or authority by an oral agreement to dispense with or override an express agreement made with the insurance company by an applicant for a policy of credit insurance in his written application for the insurance.

Where an applicant for a policy of credit insurance makes his application by filling in and signing a printed form supplied by the insurance company, without reading the terms of the application or the conditions of the policy expressly referred to in the application, which is printed on the back of the form of the policy applied for, these conditions containing a stipulation for a minimum initial loss of $500 to be borne by the insured and a stipulation that the insurance shall be void unless the person whose credit is insured is in sound financial condition on the day the premium is paid, and there is nothing to prevent the applicant from informing himself of the terms of the application and the conditions of the policy, and where also the application provides that the conditions and stipulations therein shall constitute the agreement between the undersigned and the insurance company, "any verbal or written statement, promise or agreement, by any agent of the said company to the contrary notwithstanding," the applicant is bound by the terms of the application he has signed, although at the time of signing he is assured orally by a special agent of the company that full protec-

tion will be given to the account in question without any deduction and without any proviso as to the financial condition of the person whose credit is assured when the premium is paid, and although the acts of this special agent are confirmed by the oral assurance of a general agent of the company.

CONTRACT against a credit insurance company for an alleged breach of a contract to insure or indemnify the plaintiffs against loss caused or to be caused by the failure of the Henry Siegel Company, a corporation, a debtor of the plaintiffs. Writ dated December 28, 1914.

In the Superior Court the case was referred to an auditor, who filed a report, of which the essential parts are stated or described in the opinion. He found that Goodwin and Mapes, mentioned in the opinion, "had no authority to make any contract which was binding upon the defendant" and that "there should be a judgment for the defendant." Later the case was tried before *Morton*, J. He ruled, "as a matter of law, that the evidence in the case was not sufficient to warrant the jury in finding either that the agent Mapes made such a contract and had authority to do so, or that, if he undertook to do so without authority, it was ratified." The judge ordered a verdict for the defendant and reported the case to this court for determination, with an agreement of counsel that, if his ruling was correct, judgment should be entered for the defendant; and that, if incorrect, judgment should be entered for the plaintiffs in the sum of $3,280.57.

*J. E. Hannigan*, for the plaintiffs.

*G. A. Ham*, for the defendant.

CROSBY, J. This is an action to recover damages from a credit insurance company for breach of an alleged contract to insure or indemnify the plaintiffs against loss that might be incurred by the failure of Henry Siegel Company, a debtor of the plaintiffs. A judge of the Superior Court ruled that the evidence was not sufficient to warrant the jury in finding for the plaintiffs, and ordered a verdict for the defendant. He reported the case to this court upon the agreement of counsel that, if the ruling is correct, judgment shall be entered for the defendant; otherwise, judgment shall be entered for the plaintiffs for $3,280.57.

The case was referred to an auditor, who found that on December 20, 1913, one Goodwin called on the plaintiff Wolper to solicit credit insurance. Goodwin presented his card, which described him as a

special agent of the defendant. Wolper stated that his firm had an account of about $4,500 against the Henry Siegel Company which would be due on February 1, 1914, and which they would like to insure. Goodwin called Wolper's attention to a clause in the policies which provides that in case of loss the insured must bear a certain portion thereof known as the "initial loss." Wolper stated that the insurance must have no provision for an "initial loss," whereupon Goodwin said that if two policies were issued, one of general insurance for $5,000 and a special insurance on the Siegel account for $3,000, known as a "buffer bond," the protection on the Siegel account that was desired would be given, but that "back riders" would have to attach to the policies to cover the Siegel account, a "back rider" being a clause attached to a policy by which accounts are insured within a limited time before the date of the policy. Wolper stated that, as the Siegel account would be paid on February 1 and before the expiration of the policy, he would like to have the $3,000 policy cancelled at that time and get a rebate on his premium; and Goodwin told him he would submit that proposal. Wolper signed an application for each of the two policies without reading either, gave Goodwin his check for $400 in payment of the premiums, and took a receipt, a copy of which is printed in the record. The applications with the check were sent by Goodwin to the defendant's general agent, Mapes, who forwarded them to the home office of the defendant at St. Louis on December 22. With the applications he submitted the proposal of Wolper that the $3,000 bond or policy be cancelled on February 1 after the Siegel account had been paid, and requested that Wolper be allowed a rebate on his premium. In reply the home office telegraphed that they would not issue the buffer bond with the cancellation privilege. Goodwin notified Wolper to that effect and showed him the telegram. Wolper then suggested that the buffer policy be cancelled after the Siegel account had been paid and that the defendant hold the premium rebate until the end of the year and apply it in payment for new general insurance. This new proposal was submitted to the home office by Mapes in a telegram dated December 27, and on the same date the defendant wrote a letter "in which it flatly refused to cancel the buffer policy and rebate the premium in any form," and stated in substance that the plaintiffs had better

accept a single bond of $8,000.  This letter was received on December 29 by Mapes, who gave it to Goodwin and told him to show it to Wolper, which was done.  Wolper told Goodwin that he was willing to take the single bond of $8,000 if that would protect his Siegel account, and Goodwin said it would have a special clause covering the Siegel account, that the policy would come immediately and that he might inform the bank that he was insured.  On the same day Mapes told Wolper the account was insured and that he could so state to the bank.  Again, on the morning of December 30, Mapes told Wolper that "the account was insured, the policy had no doubt been issued and that the bank might call him up to verify this."  On the same day at half past one o'clock in the afternoon, Mapes received the following telegram from the home office of the defendant: "Not willing to issue Cauman bond; will return their check to-day."  A petition in bankruptcy was filed against the Henry Siegel Company on the same day (December 30) at half past two o'clock in the afternoon.

The auditor further found that the two applications signed by Wolper "were in the defendant's usual form, printed on the back of the policies which were to be issued if the applications were accepted.  They were identical in form and were each filled out in the same way by Goodwin under the direction of Wolper, who signed them."  At the bottom of each application is printed the following clause: "This application and said Bond, if issued, shall, with the conditions and stipulations within written, constitute the agreement between the undersigned and the American Credit-Indemnity Company of New York, any verbal or written statement, promise or agreement, by any Agent of the said Company to the contrary notwithstanding.  It is also agreed that this application, whether as respects anything contained therein or omitted, therefrom, has been made, prepared and written by the applicant, or by his own proper agent."

The auditor also finds that "These applications, with the policies to which they were attached, were forwarded to the home office of the defendant on December 22.  The body of the 'buffer' policy contained a provision for an 'initial loss' of $500. to be borne by the insured.  The general policy had a provision for a minimum 'initial loss' of $500, which might in cases of a single

loss like the Siegel account, amount to $1,200. To each of the policies when forwarded to the home office was attached a printed 'back rider,' in the defendant's usual form, which covered losses on goods shipped between October 21 and the date of the policy, provided the firms whose accounts were thus covered were in sound financial condition when the premium was paid. Wolper did not examine the bodies of these policies. He did not expect that he would have to bear an initial loss if Siegel failed. He desired no insurance unless it was a full insurance and both Goodwin and Mapes understood this. Wolper relied upon Goodwin's assurance that these policies recommended by Goodwin would give him the protection he desired. Wolper never examined the back riders although he knew that Goodwin expected to attach back riders to the policies in order to secure for him protection on the Siegel account which antedated the policy. Wolper was not informed that by the terms of these back riders his insurance against Siegel would be worthless unless Siegel was in sound financial condition on the day the premium was paid. . . . If a straight policy for $8,000 had been issued to the plaintiff on the terms suggested in the letter of December 27 from the defendant's home office it would have been on the defendant's ordinary form which contains a provision for an initial loss and to which would have been attached a back rider in the same form as those already referred to, making the insurance worthless in case Siegel was not in sound financial condition on the date the premium was paid."

It is admitted that the Siegel Company was not "in sound financial condition" on December 20 when the premium was paid. Therefore under either policy issued upon the written applications signed by Wolper, there would have been no liability of the defendant by reason of the loss of the Siegel account.

The auditor further finds "that Goodwin, on December 29, made an oral contract with Wolper to procure for him insurance which would give full protection on the Siegel account without any deduction, and without any proviso as to the financial condition of Siegel when the premium was paid. It is also clear that Mapes confirmed the act of Goodwin." The question presented is whether Goodwin and Mapes or either of them had any legal authority to bind the defendant by their false and fraudulent representations made to Wolper.

It is well settled that, where the relation of principal and agent is found to exist, the principal is responsible for the acts of the agent within the apparent scope of his authority, and that an apparent general authority conferred upon an agent by his principal cannot be limited as to third persons when such limitation is not known by such persons. *Brooks* v. *Shaw,* 197 Mass. 376. *Sanford* v. *Orient Ins. Co.* 174 Mass. 416.

It is also settled that, where one contracts with an agent who apparently has a limited rather than a general authority, he is bound to make inquiry and ascertain the extent of the agent's authority to act. If one has notice that the authority of an agent is limited, he deals with the agent at his peril. *Kyte* v. *Commercial Union Assurance Co.* 144 Mass. 43.   *Hill* v. *Commercial Union Assurance Co.* 164 Mass. 406.

Goodwin was a special agent of the defendant, and this was known to Wolper. There is nothing to show that Goodwin had any authority to issue policies on behalf of the defendant or to vary the terms of any policies which the defendant might issue. He represented himself to Wolper as a special agent and the latter was bound to ascertain the nature and extent of his authority. *Lovett, Hart & Phipps Co.* v. *Sullivan,* 189 Mass. 535.

Mapes was a general agent of the defendant, and, if it be assumed that he had authority to make contracts and issue insurance policies and vary the terms of such policies and bind the defendant, although contrary to the express terms of his contract of employment, still, as an agent with the most extensive authority, he could not by contemporaneous oral representations override the express agreement made by the plaintiffs and contained in the written applications signed by Wolper.   *Allen* v. *Massachusetts Mutual Accident Association,* 167 Mass. 18.

Manifestly the limitations placed upon Mapes's authority to bind the defendant and contained in the written agreement under which he was employed would not affect the rights of third persons who, without knowledge of such limitations, dealt with him within the apparent scope of his authority. *Brooks* v. *Shaw, supra.*

The applications signed by Wolper recited that the bond "if issued, shall, with the conditions and stipulations within written, constitute the agreement . . . , any verbal or written statement, promise or agreement, by any Agent of the said Company to the

contrary notwithstanding." Among the conditions referred to was the statement that the buffer policy provided for an initial loss of $500 to be borne by the insured, and the general policy had a provision for a minimum initial loss of $500 which might, in case of a single loss like the Siegel account, amount to $1,200. Both policies also contained a stipulation or condition that the firms' whose accounts were covered by the insurance were "in sound financial condition when the premium was paid."

If Wolper did not see fit to read the applications or the conditions of the policies to which the applications expressly referred, the rights of the parties are not to be affected thereby, as there is nothing to show that he was prevented from informing himself of their contents if he so desired.

Whatever apparent authority Goodwin and Mapes had to bind the defendant, it is manifest that the plaintiffs are charged with knowledge that no representations or agreements made by Goodwin or Mapes would bind the defendant if contrary to the terms of the applications, and of the policies annexed and referred to in the applications.

The history of the transaction plainly shows that no agreement made by either agent for the issuance of policies in any form could become effective until assented to by the defendant at its home office; and this must have been known by Wolper, whose various proposals for modifications of the terms of the policies were in each instance rejected by the defendant and notice given to Wolper. Moreover the receipt which was given to Wolper upon payment of the premiums provided that the applications for insurance or indemnity were "subject to acceptance by The American Credit-Indemnity Co. of New York. In the event of the rejection of application, the above sum shall be refunded without liability on the part of said Company."

Upon the evidence as disclosed by the record, and which does not seem to be in dispute upon the facts, it is plainly apparent that no oral contract of insurance or indemnity was ever entered into or even contemplated by the parties. The evidence shows that the negotiations were all in anticipation of a written policy or policies to be issued by the defendant to the plaintiffs, which policy or policies were not issued because the parties never were able to agree upon the terms thereof. *Markey* v. *Mutual Benefit*

*Life Ins. Co.* 118 Mass. 178. *Myers* v. *Liverpool & London & Globe Ins. Co.* 121 Mass. 338, 342, 343. *Cunningham* v. *Connecticut Fire Ins. Co.* 200 Mass. 333, 337.

The language of Chief Justice Gray in speaking for this court in *Markey* v. *Mutual Benefit Life Ins. Co. supra,* is pertinent to the case at bar. It was there said at page 194: "The plaintiff's own testimony, already stated, shows that the only form of contract of insurance, contemplated by the parties, was by a policy issued by the defendant upon the written application of the assured, and there is no evidence whatever that the defendant intended, or was understood by the assured or the plaintiff to intend, to make a contract of insurance in any other form."

It further appears that, while the negotiations were pending and before the home office had accepted the plaintiffs' final offer, it learned that the Henry Siegel Company had failed and that a petition in bankruptcy had been filed against it. When the defendant learned of the financial condition of the Henry Siegel Company, it had a perfect right to refuse to issue any policy to the plaintiffs.

The finding of the auditor that neither Goodwin nor Mapes had authority to make any contract which was binding upon the defendant was well warranted. The judge correctly ruled that the plaintiffs could not recover and properly directed a verdict for the defendant.

In accordance with the terms of the report, judgment must be entered for the defendant.

*So ordered.*